IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STRUCTURAL SYSTEMS TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL FIRE & MARINE INSURANCE COMPANY; GREAT AMERICAN E & S INSURANCE COMPANY; UNDERWRITERS AT LLOYD'S, LONDON; ZURICH AMERICAN INSURANCE COMPANY and DUHAMEL BROADCASTING ENTERPRISES, <br><br> Defendants. | CASE NO.: 8:04CV194 <br><br> STRUCTURAL SYSTEM TECHNOLOGY, INC.'S BRIEF IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OF GREAT AMERICAN E & S INSURANCE COMPANY AGAINST STRUCTURAL SYSTEMS TECHNOLOGY, INC. |

Structural Systems Technology, Inc. ("SST"), Plaintiff, hereby opposes the Motion of Great American E & S Insurance Company ("Great American") for Partial Summary Judgment against it in this matter, and states in this regard that Great American has failed to adduce, by affidavit, deposition or other sworn testimony, such undisputed material facts in this action as would entitle it to judgment as a matter of law on the issues it has raised in this proceeding, with one possible exception, as will be discussed further below.

## STATEMENT OF MATERIAL FACTS IN DISPUTE AND NOT IN DISPUTE

In support of its Motion for Partial Summary Judgment, Great American has provided the Affidavit of Michele E. Young, one of its attorneys, attesting that four Exhibits are "true and correct copies." The Exhibits include: Exhibit A: Duhamel – SST contract; Exhibit B: Complaint in underlying action; Exhibit C: Purchase Order (by and between Structural Systems Technology, Inc. and Mid-Central Tower Co.); and Exhibit D: "Relevant portions" of the Great American Insurance Policy.

For the purposes of this Motion, SST admits that these Exhibits are "true and correct copies." Otherwise, SST respectfully submits that Great American has failed to come forward with other uncontroverted material facts that would justify summary judgment at this time, and Exhibits A through D do not establish such undisputed material facts as would entitle Great American to judgment as a matter of law as to the issues raised in its Motion for Partial Summary Judgment.

## ARGUMENT

### A. PROCEDURALLY, THESE ISSUES OF COVERAGE ARE NOT RIPE FOR DECISION AT THIS TIME UNDER NEBRASKA LAW.

The Nebraska Supreme Court has observed on occasion that an insurer's obligation to indemnify an insured cannot be determined until there is a final determination of the insured's obligation to respond in damages. See, e.g. *Mapes Ind., Inc. v. United States Fidelity & Guaranty Corp.*, 252 Neb. 154, 157, 560 N.W. 2d 814, 816 (1997); *Allstate Ins. Co. v. Novak*, 210 Neb. 184, 188 – 189, 313 N.W. 2d 636, 638 – 639 (1981). While the Court in *Novak* did observe that "there might be some situations where the language of the policy is such that the carrier's obligation to pay can be determined even before the insured's liability is determined," SST respectfully submits that, as to a majority of the issues raised by Great American, the present case is simply not in a posture such that the Court can decide that the undisputed underlying facts are such as to justify the entry of judgment, as a matter of law, in favor of Great American, on this Motion for Partial Summary Judgment, at this stage of the proceedings.

### B. THERE APPEARS TO BE A DISPUTE AS TO THE CONTROLLING LAW.

2

In its argument in support of Motion for Partial Summary Judgment, Great American appears to rely upon Nebraska substantive law for interpretation of the policy. This reliance by Great American upon Nebraska substantive law appears to be misplaced; SST respectfully submits that, as the policy appears to have been issued in the State of Virginia, under the circumstances of this particular case it would be more appropriate for the Court to apply Virginia substantive law to the construction and interpretation of the policy's provisions.

As shown in Exhibit D, the Policy was issued by Great American E & S Insurance Company of Cincinnati, Ohio, but the Named Insured, Structural Systems Technology, is shown to be located in Virginia, and is in fact, as reflected in the Complaint itself, a corporate citizen of the State of Virginia. The Policy itself bears a Virginia Surplus Lines Warning, as set forth on the first page of the Declaration Pages, Exhibit D.

Couch on Insurance, Third Ed., § 24:4 (2003) observes that:

> Many authorities support the view that a contract of insurance is governed as to both construction and validity by the law of the place where it was made, absent (1) special circumstances, or (2) a contractual provision or the intent of the parties to the contrary.

This treatise also notes, Couch on Insurance, Third Ed., § 24:5, that:

> The place where the contract is made is generally the place of performance of the final act necessary to complete the contract and to make it binding upon the parties. In other words, the place of the contract is the State where it is finally consummated.

The foregoing rule is still generally applicable in cases concerning the validity, construction and interpretation of policy provisions, as in the instant case.

With regard to contract actions generally, the Nebraska Supreme Court has relied upon the Restatement (Second) Conflict of Laws, § 188, to the effect that the rights and duties of contracting parties are governed by the law of the State "with the most significant relationship to the transaction and the parties." *Kirwan v. Chicago Title Ins. Co.*, 9 Neb. App. 372, 378, 612

3

N.W. 2d 515, 521 (2000). In the context of casualty insurance, Restatement (Second) Conflict of Laws § 193 is specifically applicable, and it states:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby determined by the local law of the State which the parties understood to be the principle location of the insured risk during the term of the policy, unless with respect to the particular issue, some other State has a more significant relationship under the principles stated in Section 6 to the transaction and the parties, in which event the local law of the other State will be applied.

In the present case, it is SST's position that the only rational State law to apply in interpreting and construing the provisions of the liability contracts at issue in this case is the law of Virginia, where SST itself is located. Indeed, it makes no sense to apply any other State law. Although the accident at issue in this case occurred in Nebraska, the Plaintiff in the underlying case is domiciled in South Dakota (see Exhibit 2 to Great American's Motion for Partial Summary Judgment), and the other Defendant insurers are located in various other States, and in the case of Lloyd's of London, outside the United States altogether. The only single jurisdiction applicable to all of these insurance policies, and applicable to any liability situation that may arise under these policies, is Virginia, where the policies were delivered.

Put another way, SST provides its services on location throughout the United States. If its policies of insurance were to be interpreted in each case in accordance with the law of the State where liability claims arose, the same policies would be subject to the different rules of each State where liability arose in any case where an accident or occurrence may have taken place.

4

At the very least, there must be at the present time a genuine dispute of material fact as to which State has "the most significant relationship" to these insurance contracts and the parties to this action.[1]

Choice of law makes a difference in the present case. While the Nebraska Courts follow the rule that insurance contracts are to be construed as any other contract, to give effect to the parties' intentions at the time the contract was made, see, e.g. *City of Scotts Bluff v. Employers' Mut. Ins. Co.*, 265 Neb. 707, 658 N.W. 2d 704 (2003), Virginia Courts appear to apply more liberal rules in favor of the insureds. See, e.g. *Government Employees' Ins. Co. v. Moore*, 266 Va. 155, 580 S.E. 2d 823 (2003); *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 375 S.E. 2d 727 (1989); *Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E. 2d 616 (1986); *St. Paul Fire & Marine Ins. Co. v. Nusbaum & Co.*, 227 Va. 407, 316 S.E. 2d 734 (1984).

C. **EXCLUSIONS j. (5) AND j. (6) IN THE GREAT AMERICAN POLICY ARE AMBIGUOUS, AND, WHEN CONSTRUED MOST FAVORABLY TO SST, AS REQUIRED UNDER VIRGINIA LAW, DO NOT PRECLUDE COVERAGE FOR COSTS ASSOCIATED WITH DAMAGE TO AND REPLACEMENT OF THE TOWER.**

Under Virginia law, as applied to the present case, there are several important rules of construction and interpretation that are helpful:

First, while the burden of proof may be upon the insured to establish coverage initially, it is the general rule that the burden is on the insurer to prove that a loss is excluded by the terms of the policy. See, e.g. *White v. State Farm Mut. Auto. Ins. Co.*, 208 Va. 394, 396, 157 S.E. 2d 925, 927 (1967). Furthermore, the Virginia Supreme Court has repeatedly noted that:

---

[1] Choice of law issues involve factual determinations, though the facts are decided by the court. See, e.g. *Gramercy Mills, Inc. v. Wolens*, 63 F. 3d 569, 571 (7th Cir. 1995); *Chance v. EI DuPont de Nemours & Co.*, 57 F.R.D. 165, 171 (E.D.N.Y. 1972).

5

> Insurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer.

St. Paul Fire & Marine Ins. Co. v. Nusbaum & Co., supra, 227 Va. at 411, 316 S.E. 2d at 736. See also, Government Employees' Ins. Co. v. Moore, supra, 266 Va. at 165, 580 S.E. 2d at 828; Hill v. State Farm Mut. Auto. Ins. Co., supra, 237 Va. at 153, 375 S.E. 2d at 730. The Virginia Supreme Court also noted, quoting from White Tire Distributors v. Pennsylvania Nat'l Mut. Ins. Co., 235 Va. 439, 441, 367 S.E. 2d 518, 519 (1998): "Where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail because indemnity is the ultimate object of insurance."

### (1)   *Policy Exclusion j. (5)*

Policy exclusion j. (5) in the Great American Policy excludes coverage for "property damage" to . . . [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations. . . ."

Self-evidently, this exclusion applies only to damage to that "particular part of real property" where "you" or any contractors or subcontractors were performing operations at the time of the occurrence at issue. Citing decisions from other jurisdictions, none of which involve property of the type at issue here, Great American contends that the entire tower should be considered "that particular part of real property" upon which the subcontractors in this particular case were working, because a ruling to the contrary would mean "the phrase 'that particular part'

6

could be narrowed to the point where the exclusion would cease to exist altogether." (Brief of Great American at 6).

In fact, the phrase "that particular part of real property" is particularly ambiguous, and, referring to the Virginia rule that "where two interpretations equally fair may be made, the one which permits greater indemnity will prevail because indemnity is the ultimate object of insurance," it seems that the proper interpretation of this language, in the context of the incident at issue, would mean that property damage to the specific area of the tower may be excluded from coverage, but the exclusion does not apply to damage to the entire tower.

It is noteworthy that the only "real property" where SST's subcontractors were working was the tower. They performed no services on any other "real property." If the Court were to adopt Great American's position, the language regarding "that particular part" of real property that is used in the exclusion would be rendered meaningless. Instead, Great American would have this Court rewrite this exclusion to cover property damage to the entire real property upon which the Mid-Central employees were working. In arguing this position, Great American would have this Court interpret a manifestly ambiguous provision most strongly against the insured, rather than the insurer.

The Virginia Supreme Court has apparently not had occasion to interpret this particular exclusion. Other Courts, however, have interpreted the exclusion narrowly, consistent with the rules that would be applied by a Virginia Court, as set forth above. See, e.g. *Rubalcava Constr. Co. v. Burlington Ins. Co.*, 148 F. Supp. 2d 746, 750 (N.D. Tex. 2001); *Larson Co. v. United Capitol Ins. Co.*, 845 F. Supp. 451, 455 (W.D. Mich. 1993); *Serigne v. Wildey*, 611 So. 2d 155 (La. App. 1993). One of the better rationales for a narrow interpretation of this provision is to be found in a September 1998 insurance industry Bulletin, Fire Casualty & Surety Bulletin, The National Underwriter Company, September 1998, § A. 3-12, quoted in a very recent unreported

7

decision of the California Court of Appeal for the Fourth District, *C.O.D. Gas & Oil Co., Inc. v. Ace American Ins. Co.*, 2004 W.L. 1245759, Case Number D042245 (June 8, 2004)[2]:

> To illustrate the effect of this exclusion, say that a plumbing subcontractor working for a homebuilder accidentally starts one of the builder's projects on fire while soldering copper pipes, and the entire structure is burned down. If the owner of the house sues the builder for the loss, the exclusion . . . will apply only to 'that particular part' of the structure on which the plumber was working. Thus, the named insured would be covered . . . for damage to all parts of the building other than the plumbing and all parts of the plumbing system other than the *particular* part being worked on at the time of the loss.
>
> The coverage forms do not define 'that particular part' . . . [but] in the final analysis, the use of the word 'particular' indicates that the exclusion should be applied narrowly. In the example above, the exclusion should then apply only to the two portions of pipe being soldered together; the damage to the rest of the plumbing system should not be excluded.

Based upon the contract between Structural Systems Technology and Duhamel Broadcasting, attached as Exhibit A to Great American's Motion for Partial Summary Judgment, it appears that specific work was to be performed only on certain sections of the tower, and according to the allegations in the Complaint below, the accident at issue occurred when structural components were being removed from a portion of the tower in accordance with this contract. There is, at the present time, a question of fact as to which particular part of the tower was being worked on at the time of the accident, and how much of it was being worked on at the time of the accident. Plainly, Great American has not cited any such evidence in support of its Motion for Partial Summary Judgment. There remains a genuine dispute of material fact as to the applicability of Exclusion j. (5).

    (2)    *Policy Exclusion j. (6)*

---

[2]    Rule 977 of the California Rules of Court does not permit citation or reliance upon unreported opinions except under limited circumstances not applicable here. SST does <u>not</u> offer this opinion as a precedent, or for the persuasive authority of the contents of the opinion. However, California law <u>does</u> recognize that insurance industry bulletins of this type are relevant to determine coverage questions. See, *Cunningham v. Universal Underwriters*, 98 Cal. App. 4th 1141, 1153, 120 Cal. Rptr. 2d 162, 171 – 172 (2002).

Exclusion j. (6) precludes coverage for "property damage" to . . . [t]hat particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . . Paragraph (6) of this exclusion does not apply to "property damage" included in the "Products – Completed Operations Hazard".

The term "your work" is defined on page 13 of the Policy, paragraph 21, as follows:

"Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.

The term "Products – Completed Operations Hazard" is defined in paragraph 16 of the Definitions Part of the Policy, p. 12:

"Products – Completed Operations Hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

9

>   (c)   When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The question whether "your work," as defined in the Policy, was "incorrectly performed" is, of course, a question of fact, and at this stage of the proceedings, it is certainly not an "undisputed" one.

Moreover, this Exclusion was discussed by the United States District Court for the Eastern District of Missouri in a case cited by the Defendant, Great American here, *National Union Fire Ins. Co. of Pittsburgh v. Structural Systems Technology, Inc.*, 756 F. Supp. 1232 (E.D. Mo. 1991). The Court's discussion of this issue is pertinent to the present case, since the facts at issue in the *National Fire* case are substantially identical to the facts at issue in the present case.

In *National Union*, employees of SST, the Plaintiff here and also the Plaintiff in the Missouri case, were performing work on an existing radio tower, when the tower collapsed and was totally destroyed. The owner of the tower sued SST and the manufacturer of certain diagonal rods being used by SST employees to repair the tower, seeking damages "in excess of $50,000 for damage to the tower, its transmission line, antenna system, and associated equipment, and also for the diminution in value of the stations and lost profits." 756 F. Supp. at 1236. SST made a claim for coverage and a defense on the insurer, National Union Fire Insurance Company of Pittsburgh, and National Union filed a declaratory judgment action, naming SST as Defendant. SST, in turn, filed a declaratory judgment action naming the

10

International Insurance Company as Defendant, under an "Inland Floater" policy issued by International Insurance Company to SST.

At the time of the accident at issue, SST was insured under a policy of Commercial General Liability Insurance issued by National Union Fire Insurance Company, and this policy contained exclusions essentially identical to those of Great American here. With regard to Exclusion j. (6), the Court noted that:

> The tower is not excluded because it falls within the "property – completed operations hazard" (p-coh) exception to the exclusion. Such exception applies here, since the work which was being conducted is treated as complete within the meaning of p-coh in that the work of SST on the tower is characterized as "service, maintenance, correction, repair or replacement." The other equipment alleged to have been damaged is not excluded because it was not being restored, repaired or replaced.

In the present case, SST subcontracted the work to be performed on the tower to Mid-Central, but, as with the situation in the *National Union Fire* case, the work being performed by Mid-Central's employees at the time of collapse of the tower is properly characterized as "service, maintenance, correction, repair or replacement," as those terms are used in the Products – Completed Operations Hazard portion of Great American's Policy.

In the *National Union Fire* case, the tower at issue had been constructed, and was transmitting, not later than September 21, 1987. 756 F. Supp. at 1236. Subsequently, defects were discovered in the tower, and SST had revoked acceptance of certain diagonal steel rods used in the construction of the tower by letter to their manufacturer, L. & R. On December 15, 1987, L. & R. had agreed to replace the diagonal steel rods, but at the time of the collapse on June 2, 1988, SST employees were repairing the tower and replacing diagonal rods on the tower. At the time of the collapse, the tower was transmitting.

In the present case, the tower was also fully constructed. SST contracted to do replacement work on the tower, replacing diagonal braces at certain places in the tower to

11

support digital transmission equipment, as described in the contract that is Exhibit A to the Motion for Partial Summary Judgment. This replacement work was being conducted when the tower collapsed. In this respect, the current situation is virtually identical to the situation presented in the *National Union Fire* case, and the Property – Completed Operations Hazard exception to Exclusion j. (6) is applicable in this case just as it was applicable in the *National Union Fire* case.

Once again, SST emphasizes that ambiguities in the contract, including in the P-COH provisions, are to be construed most strongly against Great American, and, following the opinion of the United States District Court for the Eastern District of Missouri in *National Union Fire Ins. Co. v. Structural Systems Technology, Inc.*, supra, it seems plain that exception j. (6) is not applicable here.

### (3)   *Coverage for Lost Profits*

Great American argues that because its policy excludes coverage for "property damage" to the tower, under Exclusion j. (5) and j. (6), it does not provide coverage for lost profits. Since, as set forth above, there are genuine disputes of material fact as to whether Exclusions j. (5) and j. (6) are applicable in the present case, this contention of Great American is also subject to a genuine dispute of material fact, and Great American is not entitled to exclude "lost profits" as a matter of law at this stage of these proceedings. It is noteworthy in this respect, as defined in the Policy, page 13, paragraph 17, property damage includes "physical injury to tangible property, including all resulting loss of use of that property." Since "property damage" includes loss of use, and since lost profits are the pecuniary result of "loss of use," this policy does provide coverage for lost profits to the extent that Exclusions j. (5) and j. (6) may not be applicable.

12

D.  **THE GREAT AMERICAN POLICY PROVIDES COVERAGE FOR SOME, IF NOT ALL, OF THE CLAIMS OF DUHAMEL BROADCASTING ENTERPRISES FOR BREACH OF CONTRACT.**

There are two Counts for breach of contract in the underlying action, Exhibit B to the Motion for Partial Summary Judgment. "Claim 1," predicated on breach of contract, contends that SST breached its contractual undertaking to Duhamel because "SST, its employees or agents, failed to perform the work contracted for in a good and workman-like manner thereby resulting in the collapse of Plaintiff's 1,965 guyed tower."

"Claim 1," though brought as a breach of contract claim, has as its gravamen the "occurrence" that is at issue in this case. The "Insuring Agreement" set forth in paragraph 1 of Section I – Coverages – page 1 of the Great American Policy, does not differentiate between tort and contract claims. Instead, the pertinent language states "we will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. Subsection b. of this paragraph 1 states:

This insurance applies to "bodily injury" and "property damage" only if:

(1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2)  The "bodily injury" or "property damage" occurs during the policy period.

There is no question that Count I states a claim for "property damage," as it is directed to the loss of the tower and consequential damages arising out of such loss.

The term "occurrence" in the Policy means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Paragraph 13, page 12, Great American Policy. There seems to be no question that the collapse of the tower was accidental, and that the collapse of the tower thereby constituted an "occurrence" within the meaning of the policy. Compare, e.g. *National Union Fire Ins. Co. of Pittsburgh v. Structural*

13

*Systems Technology, Inc.*, supra, 756 F. Supp. at 1237. It would appear to make no difference whether the claim for property damage arising out of the destruction of the tower is brought under a contract or tort theory, the gravamen – the accidental destruction of the tower – is precisely the same.

Great American states that "breach of contract is intentional conduct that is not caused by an 'accident' and therefore is not an 'occurrence' within the meaning of a liability insurance policy." Clearly, Great American cannot mean that all breaches of contract are intentional. A party to a contract may, and frequently will, breach it by virtue of negligent or even totally innocent conduct, and in fact, breach of contract is by definition a theory of liability without fault – if the contract has been breached, there is entitlement to damages whether or not the breach was intentional, negligent or otherwise. The cases cited by Great American do not support the general proposition that all claims for breach of contract are outside the coverage of a comprehensive general liability policy. *Nutmeg Ins. Co. v. Clear Lake City Water Authority*, 229 F. Supp. 2d 668, 695, merely states that "the Court concurs that generally liability policies do not cover <u>intentional</u> breaches of contract by an insured." In *Jakobson Shipyard, Inc. v. Aetna Cas. & Surety Co.*, 775 F. Supp. 606, 610 (S.D.N.Y. 1991), the Court found that the allegations of the complaint established "that the judgment and loss suffered by Jakobson resulted not from an occurrence as that term is defined by the CGL policy, but rather from a breach of warranty." Since there was an occurrence in the present case, as established by the *National Union Fire Ins. Co. of Pittsburgh v. Structural Systems Technology, Inc.* case, *Jakobson* is inapposite. The case of *Pavarini Construction Co. v. Continental Ins. Co.*, 759 N.Y. Supp. 2d 56 (App. Div. 2003) simply stated without further explanation that "a contract default under a construction contract" was not a "accident" under the pertinent policy.

In the case of *Union Ins. Co. v. Hottenstein*, 83 P. 3d 1196 (Colo. App. 2003), the liability established through arbitration was based entirely upon the defective condition of work done on the plaintiff's house – there was no claim for, and no allegation of, any "accident" or "occurrence." Finally, in *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W. 2d 100 (Iowa 1995), a situation was presented essentially similar to that in *Hottenstein*, supra: The Court found that no "occurrence" had taken place, and the claim was entirely one to recover damages based upon poor workmanship on the part of a construction contractor.

SST does agree that the claim for "breach of contract – insurance" set forth in Claim 2 of the underlying Complaint does not allege damages resulting from an "occurrence" as that term is used in Great American's Policy. Since this claim, such as it is, appears to be exclusively derived from an allegation that SST breached its contract with Duhamel "by failing to obtain the required Insurance," there is no allegation of an "occurrence" resulting from the alleged failure to obtain insurance, and thus this claim, and this claim alone, is not covered under the Great American Policy.

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Motion for Partial Summary Judgment of Great American be denied, except for that portion seeking judgment that no coverage exists for the allegations in Claim 2 of the Complaint in the matter of *Duhamel Broadcasting Enterprises v. Structural Systems Technology, Inc.*, Case Number 8:03CV47.

Respectfully submitted,

STRUCTURAL SYSTEMS TECHNOLOGY, INC.,
Defendant.

BY  /s/   Angus R. Everton
    Angus R. Everton
    MORGAN SHELSBY CARLO DOWNS & EVERTON P.A.
    4 North Park Drive
    Suite 404
    Hunt Valley, Maryland 21030
    (410) 584-2800
    Email: areverton@morganshelsby.com


BY  /s/   Ronald E. Temple
    Ronald E. Temple
    GATZ, FITZGERALD, VETTER & TEMPLE
    Suite 300
    100 North 13th Street
    P. O. Box 1407
    Norfolk, NE  68702-1407
    (402) 371-7770
    Email: rtemple@ncfcomm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of June, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Richard P. Jeffries, Esquire | Patrick W. Kennison, Esquire |
| John R. Douglas, Esquire | William R. Johnson, Esquire |
| William M. Lamson, Esquire | Nancy F. Peters, Esquire |
| Richard W. Ratz, Esquire | Michele E. Young, Esquire |

/s/   Ronald E. Temple