IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FIREMAN'S FUND, | ) | |
| | ) | |
| Plaintiff, | ) | 8:03CV341 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| STRUCTURAL SYSTEMS | ) | |
| TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| STRUCTURAL SYSTEMS | ) | |
| TECHNOLOGY, INC., | ) | 8:04CV194 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| NATIONAL FIRE & MARINE | ) | |
| INSURANCE CO., et al. | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on cross-motions for summary judgment on issues of coverage filed by Structural Systems Technology, Inc. (hereinafter, "SST"), Filing No. 58 in 8:03CV341, Filing No. 97 in 8:04CV194; Zurich American Insurance Co. ("Zurich"), Filing No. 92 in 8:04CV194; Duhamel Broadcasting Enterprises ("Duhamel"), Filing Nos. 58 & 100, supplemented by Filing Nos. 113 & 114 in 8:04CV194 and Filing No. 61 in 8:03CV341; and Underwriter's at Lloyd's of London ("Lloyd's, London"), Filing No. 101 in 8:04CV194. Great American E&S Insurance Co. ("Great American"), Fireman's Fund and National Fire and Marine ("National Fire") have also filed statements of position on the coverage issue, Filing No. 95 in 8:04CV194, Filing No. 106 in 8:04CV194, and Filing No. 108 in 8:04CV194. In essence, SST and Duhamel seek a declaration that the respective

insurers should cover damage to Duhamel's property as the result of the collapse of Duhamel's 1,965-foot-tall guyed television transmission tower in Hemingford, Nebraska, on September 24, 2002.  The insurers seek a declaration that there is no coverage under each of their respective policies and some argue that another insurer's policy provides coverage or a duty to defend.[1]   The liability of SST for the collapse of the tower was established in the related case of *Duhamel Broadcasting Enters. v. Structural Sys. Tech., Inc.*, No. 8:03CV47, Memorandum and Opinion (Mem. Op.) (D. Neb. June 8, 2005) ("the underlying action"); Filing No. 76 in 8:04CV194; Filing No. 45 in 8:03CV341.

## I.  BACKGROUND

### A.  Statement of the Case

These consolidated actions seek a declaratory judgment with respect to the rights and responsibilities of the respective parties for coverage for property damage to the tower under certain contracts of insurance.  The facts are set forth in this court's Memorandum Opinion in the underlying action and need not be repeated here.  *See id.*, Filing No. 67, Memo. Op. at 1-6.  Briefly, the court found that SST had agreed, pursuant to contract, to design, furnish and install redundant horizontal members and stronger diagonal members on the Hemingford tower.  *Id.*, Memo. Op. at 2-3; Trial Exhibit ("Trial Ex.") 1.  SST contracted, in turn, with Mid-Central Tower Company ("Mid-Central") to provide the labor, tools, and equipment for the installation.  *Id.,* Memo Op. at 4; Trial Ex. 3.  The contract between SST and Duhamel provided that SST's quoted price included workers' compensation insurance in the statutory amount, automobile liability insurance in the

---

[1]In addition, Great American seeks indemnity and/or contribution from National Fire for defense costs. Great American defended SST in the underlying action, but did so under a reservation of rights.

amount of $1 million, commercial general liability insurance ("CGL") in the amount of $1 million, umbrella (excess) liability insurance in the amount of $10 million, and builders all risk insurance in the amount of $2.5 million.  *Id.,* Trial Ex. 1 at 2.  The contract between SST and Mid-Central required that Mid-Central provide insurance that listed SST as an additional insured for CGL coverage in the amount of $1 million.  *Id.*, Tr. Ex. 3.

At the close of evidence in the trial of the underlying action, this court sustained Duhamel's motion for judgment as a matter of law on the issue of liability. *Id.*, Memo. Op. at 1.  The court found that Mid-Central's negligence was the cause of the tower's collapse and that Mid-Central's negligence could be imputed to SST under agency principles.  *Id.* at 8-9.  The court further found that SST was independently liable for failing to properly supervise Mid-Central.  *Id.* at 14-15.  The court also found that SST had breached its contract with Duhamel in failing to supervise Mid-Central, but noted that the damages for the breach of contract were co-extensive with the damages for negligence.  *Id.* at 11.  The case was submitted to the jury for determination of damages only.  *Id.* at 1.   In answer to special interrogatories, the jury determined the value of Duhamel's losses and the court entered judgment in favor of Duhamel and against SST in the amount of $3,239,243.01.[2] *Id.,* Filing No. 63, Jury Verdict; Filing No. 68, Order and Judgment.  The court held the parties' motions to amend the judgment in abeyance pending resolution of the  coverage issues herein.  *Id.*, Filing No.  76.

### B.  The Policies

---

[2]This amount represents the reasonable and necessary cost of building a tower similar in quality to the Hemingford tower plus the reasonable value of miscellaneous expenses, including clean-up and shut-down costs, incurred in connection with the collapse of the tower. *See id.*, Filing No. 63, Jury Verdict at 2.

3

Five policies of insurance arguably provide coverage to SST for its liability to Duhamel for the tower collapse.[3]  Fireman's Fund insured SST for "inland marine coverages" with a limit of $2.5 million for any one loss disaster or casualty from October 10, 2001 to October 31, 2002, policy no. MXI-97301479.  Filing No. 107, Index of Evidence,  Ex. 1 ("Fireman's Fund Policy).  Great American insured SST under a commercial general liability policy, policy no. GLO 575 17 05, with limits of $1 million per occurrence for the coverage period from October 31, 2001 to October 31, 2002.  Filing No. 33, Great American Answer and Cross-claim, Ex. A1 ("Great American Policy").  Lloyd's, London insured SST under a "Professional Liability (claims-made form)" certificate, effective from January 1, 2002 to January 1, 2003, with a retroactive date of January 1, 2001, certificate no. A2002MP00002380.  Filing No. 104, Index of Evidence, Ex. 1, Complaint, Ex. 4 (the "Lloyd's, London Certificate").  Zurich insured SST under an Architects and Engineers Professional Liability Policy, policy no.  EAC9308433 00, to SST for the period January 1, 2003 to January 1, 2004 with a retroactive date of January 1, 2001.  *Id.,* Ex. 5 (the "Zurich Policy").  In addition, SST is named as an additional insured under a commercial general liability policy issued by National Fire to Mid-Central Tower Co., for the period from January 13, 2002 to January 13, 2003, No. 72LP 14 03 27.  *Id.*, Ex. 3 (partial copy); Filing No. 44, Index of Evidence, Ex. 1, Affidavit of Michelle Young, Ex. F (hereinafter, "National Fire Policy).  Claims were filed under each of these policies and were denied by the insurers for various reasons.  *See* Filing No. 1 in 8:04CV194,

---

[3]Duhamel was also covered by a policy of insurance issued by Royal Insurance Company.  This court and the Eighth Circuit Court of Appeals found coverage for Duhamel's damages had been properly denied under exclusions for property undergoing repair and faulty workmanship.  *See Royal Ins. Co. v. Duhamel Broadcasting Enters.*, No. 8:02CV577, Mem. and Order at 27.  D. Neb. May 9, 2005), *aff'd*, No. 05-2539, slip op. at 5 (8th Cir. March 13, 2006).

Complaint; Filing No. 26 in 8:03CV341, Amended Complaint; Filing No. 44, Great American Index of Evidence, Ex. 1, Affidavit of Michelle Young, Ex. D, Correspondence.

### 1.    Fireman's Fund Inland Marine Policy

The Fireman's Fund Policy includes two sets of declarations.  In its "General Declarations," the policy provides that "the insurance provided by this policy consists of the following coverage form(s) . . . INLAND MARINE COVERAGES."  Filing No. 107, Ex. 1, Fireman's Fund Policy at 2, (GD-1).  Under "Installation Floater Declarations—Commercial Inland Marine," the policy states "[i]nsurance is provided only for those coverages for which an 'x' is entered in the applicable box and limits of liability or amounts of insurance are stated in the place provided in the declarations."  *Id.* at 3 (form 345174DEC 08-88).  An "x" is marked next to the box indicating a monthly reporting period and next to a box indicating "1. Completed tower value 2. Monthly receipts for service work" as the premium base.  *Id.* The declarations page further provides that "the limitation of liability at any one installation site is $2.5 million."  *Id.*  Nothing is entered in the space on the page for "Location and Description of Property Covered."  *Id.*

"Commercial Inland Marine Coverage Form" provides that the "Property and Interests Covered" are: "materials, supplies, machinery, equipment and fixtures, property of the Insured or similar property of others for which the Insured has assumed liability and which the Insured has contracted to install or erect, provided the values of such property of others are included in reports required elsewhere, if this policy is written on a reporting form basis."  *Id.* at 4*, *¶ 1 (form 345174 8-88 at 1 of 4).  Under "duration of coverage," the policy provides:

This policy attaches from the time the property is at the risk of the Insured and, except as excluded elsewhere in the policy, covers continuously thereafter during transit, while awaiting and during installation, and terminates when:

     a.    the interest of the Insured in the property ceases, or

     b.    the installation or erection of the property is completed and accepted as satisfactory, or

     c.    this policy expires or is cancelled:

whichever of the foregoing conditions first occurs.

*Id.* at 4-5, ¶ 3.

By Amendatory Endorsement entitled "Concurrent Cause," the "Perils insured" under the policy were broadened from "all risks of direct physical loss of or damage to the property covered hereunder <u>from any external cause</u> . . . except as provided elsewhere in this policy" (emphasis added) to "risks of direct physical loss or damage to the insured property unless the loss or damage is excluded under the Perils Excluded section of this policy." *Id.*, at 5, ¶ 6; 10, ¶ 1 (form 141731 6-84 at 1) (form 3451748-88 at 2 of 4). Among the listed "Perils Not Insured" is "the cost of making good faulty or defective workmanship or material," however, by its terms, the exclusion does not apply "to physical damage to other property insured under this policy resulting from such faulty or defective workmanship or material." *Id.* at 5, ¶ 7g (form 435174 8-88 at 2 of 4). The "Concurrent Cause" endorsement adds "collapse" to the list of excluded perils "except as provided in the Additional Coverage-Collapse section of this endorsement" (form 141731684 at 2 of 2). *Id.* at 10, ¶ 2(b)(4). The "Additional Coverage-Collapse" provision adds coverage as follows:

>     **Additional Coverage-Collapse**. This policy insures against risk of direct
>     physical loss or damage involving collapse of a building or structure or other
>     insured property or any part thereof caused by one or more of the following:
>
>     . . .
>
>     f.     Use of defective materials or methods in construction,
>            remodeling or renovation if the collapse occurs during
>            the course of the construction, remodeling or
>            renovation.

*Id.* 11, ¶ 3(f) (form 1417316-84 at 2 of 2). Under "Valuation and Limits of Liability," the

policy provides that the company will be liable for the actual cash value of the property at

the time of loss, including labor and other charges and expenses accrued thereto but not

exceeding the amount which it would cost to repair or replace the property . . . " *Id.* at 5,

914 (form 3451748-88 at 2 of 4). The "General Conditions" of the policy provide that "the

declarations shows you which coverage you have purchased and the limits of insurance

that apply" and cautions that "you have those coverages and amounts of insurance." *Id.*

at 15, ¶ A(3) (form 140559 12-86R at 2 of 4). The "General Conditions" also provide that

"[i]f this coverage applies only at specified locations, they are shown in the Declarations."

*Id.*, ¶ 3. As noted, no locations are listed in the Declarations. Another "General Condition"

provides that "[t]he coverage provided under the policy shall apply as excess insurance

over any other valid and collectible insurance coverage that applies to the covered

property." *Id.* at 17, ¶ B(1) (form 140559 12-86R at 4 of 4). In addition, the Installation

Floater Declarations page indicates that coinsurance is 100%. *Id.* at 3 (form 345174 DEC

08-88).

The premiums under the policy were determined according to a formula that took

into account both "completed tower value" and "monthly receipts for service work." *Id.* at

3.   Reporting was required under three categories:   (1) towers that exceed over $1,000,000; (2) towers up to $999,999; and (3) service work.  *Id.* at 23-24.  SST provided monthly reports entitled "Builders' Risk Reports" to Fireman's Fund each month from October 2000 to October 2002.  *See* Filing No. 107, Index of Evidence, Ex. 2, Aff. of Thomas Ingraham, Ex. A, Monthly Reports.  SST reported the work performed for Duhamel on the Hemingford tower (KDUH) in its monthly report for the months of August and September 2001.  *Id.*  at 11-12.  For the period from October 2000 to October 2002, only one tower was reported under either category (1) or (2).  *Id.* at 1-25.  The Brown Road tower in Orlando was reported under "towers under construction that exceed $1,000,000 in completed value" from October 2000 until March 2001.  *Id.* at 1-5.  The limit of liability for damage to that tower was increased to $4 million by endorsement.  Filing No. 107, Ex. 1, Fireman's Fund Policy at 26.

An endorsement to the policy provides that the policy excludes "loss or damage caused by or resulting from/to:

A.   <u>Flood</u>:  For any tower situated in Flood Zone A or B as defined by the Army Corp. of Engineers.

B.   <u>Earthquake</u>:  For any tower situated in Earthquake Zone A, B, or C, established by Insurance Service Organization.

C.   Within 25 miles from coast.

D.   Any tower exceeding $2,000,000.

Unless the insured submits for separate underwriting full details of the construction of the tower, location, its proximity to any coastal area, flood or earthquake zone described above.

*Id.* at 25, (Endorsement No. 1).  The "Installation Floater Combination Endorsement" provides that "it is agreed that Exclusion 7.k, loss, damage or expense caused by or

8

resulting from testing is deleted from part 7, Perils Not Insured."[4]  *Id.* at 8 (form 345178 3-83).

Fireman's Fund submits the affidavit of Thomas Ingraham, a Fireman's Fund employee familiar with the policy, though not involved in the original underwriting and placement of the policy.  Filing No. 107, Ex. 3, Affidavit of Thomas Ingraham at 2, ¶ 2.  In his affidavit, Ingraham states that "[a]n installation Floater policy is a unique type of insurance of limited scope, designed to provide coverage for a specific PROPERTY."  *Id.* at 2, ¶ 4 (emphasis in original).  Ingraham considers the covered property to be limited to "materials, supplies, machinery, equipment and fixtures while in transit to, during periods of temporary storage, and during the installation and erection of PROPERTY at project sites."  *Id.* (emphasis in original).  Further, Ingraham does not perceive the policy to be "a Builder's Risk Insurance policy which is a separate and distinct form of Inland Marine coverage applicable to the new construction or renovation of real property which are typically buildings."  *Id.*  The affidavit shows that Fireman's Fund had "underwriting knowledge of SST's business as a trade contractor engaged in the principal activity of erecting and maintaining radio and television towers."  *Id.* at ¶ 5.  The affidavit also shows that SST requested the $2.5 million limit per installation site and that on one occasion that limit was increased to $4 million "to accommodate the erection/construction of a new communications tower in Orlando, Florida."  *Id.*  Fireman's Fund concedes in the affidavit

---

[4]Another endorsement purports to modify the "Installation Floater Combination Endorsement" (form 345178 3-83) to limit liability for flood and earthquake to $2,000,000 and set the deductible at $25,000.  *Id.* at 28, Endorsement No. 004.  Actually, the "Installation Floater Combination Endorsement" already contained those limits and deductible amounts.

that SST reported the work performed on the Duhamel tower in accordance with the policy requirements.  *Id.* at ¶ 6.

Fireman's Fund asserts that the policy covers property damage only and also argues that the policy is not a "builder's risk" liability insurance policy.  It argues the tower is not covered because it is not "property of others" that is "similar" to "materials, supplies, machinery, equipment, and fixtures" of the insured.  It also argues that the tower is not covered because SST had not contracted to "install or erect" the tower, but rather to perform service, maintenance, or repairs on it.  Fireman's Fund also contends that the tower is not covered because its value was not reported "in reports required elsewhere" under the policy.

### 2.  Great American CGL Policy

Great American's Policy provides that Great American "will pay those sums that the insured [SST] become[s] legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Great American CGL Policy at 40, § I(1)(a) (form CG 00 01 07 98 at 1 of 13)  The policy applies "to 'bodily injury' and 'property damage' only if . . . caused by an 'occurrence' that takes place in the 'coverage territory'" and during the policy period.  *Id.*, § I (b)(1) & (2).  Under the policy, "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same conditions."  *Id.* at 51, § V(13) (form CG 00 01 07 98 at 13 of 13).  "Accident" is not defined in the policy.

In the "Declarations" section of the policy, SST's business is described as "Radio/TV Tower Repair" and the premium basis for work performed by SST's employees is $500,000 (payroll) and for work performed by subcontractors is $2,000,000 (total cost).  *Id.* at 1

10

(Declarations at 1 of 1). SST's premium for the policy was $82,800. *Id.* The policy excludes coverage for "property damage" due to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." *Id.* at 43, § I(2)(j)(5) (form CG 00 01 07 98 at 4 of 13). It also excludes property damage due to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." *Id.*, § I(2)(j)(6). However, the exclusion contained in Exclusion j(6), set forth above, "does not apply to 'property damage' included in the 'products completed operations hazard.'" *Id.*, § I(2)(j).

"Your work" is defined in the policy as: "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations." *Id.* at 52, § V(21) (form CG 00 01 07 98 at 13 of 13). "Products completed operations hazard" ("PCOH") includes "all bodily injury and property occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" *Id.,* § V(16). "Work that has not yet been completed," however, is an exception to the PCOH. *Id.* The policy Declarations show that an aggregate limit of liability of one million dollars applies to the products completed operations hazard. *Id.* at 1. (Declaration at 1 of 1.)

Under "Commercial General Liability Conditions," the policy contains an "other insurance" clause that provides for sharing of liability "[i]f other valid and collectible insurance is available for a loss we cover . . . and the other insurance is also primary." *Id.* at 48, § IV (4) (form CG 00 01 07 98 at 9 of 13). However, the "other insurance" clause also provides that:

This insurance is excess over:

(1)  any of the other insurance, whether primary, excess, contingent or on any other basis:

(a)   That is fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work"

. . .

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

*Id.*

Great American argues that the collapse arose out of activities that are excluded under Exclusions j(5) and j(6) of the policy because SST and/or its subcontractor, Mid-Central, were working on the tower at the time it collapsed.[5]  This argument is essentially that the policy does not cover a "business risk," that is, the insured's defective construction resulting to damage to its own work.  It argues that if the policy were to cover liability for economic damages for unsatisfactory work, the policy would be in the nature of a "performance bond."  It also argues that National Fire has a duty to indemnify and to defend SST under its policy issued to Mid-Central, under which SST is an additional insured.  It asserts it is entitled to pro-rata contribution from National Fire for defense costs to date as well as any future defense costs.   Great American concedes, however, that damage to a structure other than the tower is not excluded from coverage.  It thus

---

[5]In its first motion for partial summary judgment, Great American also argued that its policy did not cover Duhamel's loss of use of the tower or lost profits or damages for breach of contract.  Filing No. 50 in 8:03CV341.  Duhamel's claims for loss of use/lost profits and breach of contract are no longer at issue.  Duhamel abandoned the claim that SST breached the contract by failing to procure builder's risk insurance.  *See Duhamel Broadcasting Enters. v. Structural Systems Technology*, No. 8:03CV47, Filing No. 49, Plaintiff's Proposed Jury Instructions at 16.  This court found that Duhamel's damages for any breach of contract involving failure to properly supervise construction mirror the damages for negligence as a result of that failure.  *See id.*, Filing No. 76, Mem. Op. at 11.

12

concedes coverage for damage to other structures.  *See* Filing No. 95, Great American's Brief at 3.

### 3.  National Fire CGL Policy (with SST as an additional insured)

In accordance with the contract between SST and Mid-Central, SST is named as an additional insured in an endorsement to the National Fire Policy "but only with respect to liability arising out of 'your ongoing operations performed for the additional insured(s) at the location designated above'" and "[a]cts or omissions of the additional insured(s) in connection with  their general supervision of such operations."  Filing No. 44, Index of Evidence, Ex. F at 3, § I (A) & (B) (form CG 20 09 10 93 at 1 of 2) ("Additional Insured Endorsement").  Most substantive terms of the National Fire CGL Policy are identical to those set forth in the Great American CGL Policy, and the same form, CG 00 01 07 98, is used.  *See id.* at 15-27 (form CG 00 01 0798 at 1 of 13 - 13 of 13).  The policy contains provisions identical to Exclusions j(5) and j(6) discussed above  with respect to the Great American, do not apply to the additional insured.  *See id.* at 3, § 2(A) (form CG 20 09 10 93 at 2).  *Id.* at 18 (form CG 00 01 07 98 at 4 of 13).  The Additional Insured Endorsement provides, however, that certain exclusions that apply to the named insured, including Exclusions j(5) and j(6).

The Additional Insured Endorsement's exclusion of "'bodily injury' or 'property damage' arising out of any act or omission of the additional insured(s) or any of their 'employees,'" expressly does not apply to those arising out of "the general supervision by the additional insured(s) [SST] of your [Mid-Central's] ongoing operations performed for the additional insured(s)."  *Id.*, § 2(B)(3).  Also excluded from coverage in the Additional

Insured Endorsement is property damage to property in the care, custody or control of the additional insured.  *Id.* at 4,  § 4(b) (form CG 20 09 10 93 at 2 of 2).

The policy additionally excludes coverage for certain risks such as explosion, collapse and underground property damage (the "collapse hazard" exclusion).  *Id.* at 2, § A, ¶ A (form CG 21 43 0196 at 1 of 1).  An exception to the collapse hazard exclusion however, provides:

> This exclusion does not apply to:
>
> a.     Operations performed for you by others;
>
> b.     "Property damage" included within the Products Completed Operations hazard; or
>
> c.     Any operation described in the schedule above, if any of these hazards is a covered hazard.

*Id*.  In the referenced Schedule, "Operations" are listed as "Communications Eq. Install" and nothing is entered under "Covered Hazard(s)."  *Id*.

The policy also includes, as a condition, an "other insurance" clause that was originally identical to that discussed above in connection with Great American's policy, but was modified by endorsement to provide:

> If other valid and collectible insurance is available to the Insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
>
> > This insurance is excess over any other insurance whether the other insurance is stated to be primary, pro rata, contributory, excess, contingent, or on any other basis; unless the other insurance is issued to the Named Insured shown in the Declarations of this Coverage Part and is written explicitly to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.
> >
> > When this insurance is excess, we will have no duty under Coverage A or B to defend the Insured against any "suit" if any other insurer has

14

a duty to defend the insured against that "suit."  If no other insurer defends, we will undertake to do so, but the insured's rights against all those other insurers who have a duty to defend the insured are transferred to us.  The insured must do nothing to impair them.  At our request, the insured will bring "suit" to transfer those rights to us and help us enforce them.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1)      The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2)      The total of all deductible and self-insured amounts under all that other insurance.

*Id.* at 5 (form M 4685 (9/96)).

National Fire denies coverage based on its contention that the loss is excluded by the collapse hazard exclusion, contending that the exception to the exclusion does not apply because "you" in the exception refers only to Mid-Central and not to SST.  It also asserts that the care, custody or control exclusion in the Additional Insured Endorsement excludes coverage.  To the extent that its policy is found to provide coverage, it argues the coverage is excess.

### 4.  Lloyd's, London A&E policy

The Lloyd's, London Certificate provided coverage to SST for "CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD" for "those sums which the insured shall become legally obligated to pay as damages by reason of any negligent act or error or omission in professional services rendered . . . arising out of the conduct of the named insured's business as described in the Declarations."  Filing No. 104, Index of Evidence, Ex. 1 at 7,  § II(A) and (B).  The Declarations describe SST's business as "solely in the performance of structural design

15

and analysis services related to radio and TV towers." *Id.* at 3, ¶ 1. The policy period ended on January 1, 2003. *Id.* at 3. The policy, however, provides for an automatic thirty-day extension of the policy coverage period if the named insured cancels or does not renew the policy and a twelve-month extension if the insurer cancels the policy. *Id.*, ¶ 4. In an endorsement, the policy also specifically excludes coverage for any claim covered by Great American's CGL policy.[6] *Id.* at 16. Endorsement No. 4, Cross Policy Exclusion.

Lloyd's, London has presented evidence that it wrote to SST on November 13, 2002, stating that "may be unable to offer renewal of" the policy because of "changes in underwriting criteria and/or the availability of reinsurance." Filing No. 104, Index of Evidence, Ex. 2, Aff. of Robert C. Keyser, Ex. A. Lloyd's, London later extended a proposal to SST's agent, conditioned on its ability to obtain reinsurance coverage, for renewal of the contract in December 2002. *Id.*, Ex. B. The record does not show that the proposal was ever conveyed to SST or whether an unconditional proposal was conveyed to SST. SST did not renew the policy. *See id.*, Ex. 2, Aff. of Robert Keyser at 3.

Lloyd's, London bases its denial of coverage on the assertion that the tower's collapse was not caused by any negligence in performance of the functions covered under its policy, that is, negligence in design or engineering, and the claims thus fall outside the ambit of the policy's coverage. It further asserts that, if covered, SST's claim was made outside the policy period.

### 5. Zurich Policy

---

[6]Great American's policy correspondingly excluded coverage for any claim covered by an A&E policy. *See* Filing No. 33, Ex. A1 at 15 (form CG 22 79 07 98 at 1 of 1.

Effective January 1, 2003, SST became insured under a policy of claims-made Architects' and Engineers' Professional Liability Insurance issued by Zurich Policy Number EOC 9308433 00.  Filing No. 1, Complaint, Ex. 5 at 1.  The policy is effective for claims made between January 1, 2003 and January 1, 2004, and has a retroactive date of January 1, 2001.  *Id.*  With respect to coverage, the Zurich Policy provides that Zurich will pay all sums for claims first made against SST and reported to Zurich within the policy period that arise out of a negligent act, error or omission in "professional services."  *Id.* at 2, § I (A) & (B).  Coverage was conditioned on the fact that "[p]rior to the effective date of the first policy issued to you . . .  no principal, partner, director or officer of yours had knowledge of any circumstances that could reasonably be expected to result in a "claim."  *Id.*, § I(C).

"Professional services" are defined under the policy as "those services specifically described in the application which you are legally qualified to perform for others," including professional services as either an architect, engineer or construction manager.  *Id.* at 3, ¶ I(1) and I(3).   The term "Construction Management" is defined as "providing of construction expertise in the form of recommendations to the owner and design professional(s) during the planning, design, construction, postconstruction phases, the scheduling of construction and the overall coordination of consultants and contractors during the construction."  *Id.* at 15, Endorsement 3,  ¶ K.  The policy provides the company agrees to provide coverage "in reliance upon the statements in the application."  *Id.* at 2.

SST applied for this policy on January 6, 2003.   *See* Filing No. 94, Index of Evidence, Ex. A, Declaration of Michael Dobner, Ex. A, Application.  In the application, SST was asked whether the firm was aware of "any circumstances, incidents, situations . . . or

17

accidents during the past ten years . . . which may result in claims being made against [SST]" and whether SST "ha[d] knowledge of injury to people or property during the past five years on or at projects where [SST] has rendered professional services." *Id.* at 7.  An "x" was noted in the space indicating "No" in answer to the query.  *See id.* The collapse of the Duhamel tower on September 24, 2002, was not disclosed to Zurich.  The Zurich Policy became effective on January 1, 2003.  Duhamel filed the action against SST on February 7, 2003.

Zurich argues that its claims-made policy does not cover any claim arising from known events that occurred before the policy period.  It asserts that its policy covers claims that arise from events that occur before the policy period only if SST's management was not aware of the events potentially leading to liability.  Zurich argues that it is obligated neither to defend nor to indemnify SST for the claim arising from the tower's collapse.

## II.  DISCUSSION

### A.  Summary Judgment Standards

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(C); *Harder v. ACandS*, Inc., 179 F.3d 609, 611 (8th Cir. 1999).  In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  *Koehn v. Indian Hills Cmty. Coll.,* 371 F.3d 394, 396 (8th Cir. 2004).  An insurance policy is a contract.  *Callahan v. Washington Nat. Ins. Co.*,

608 N.W.2d 592, 597 (Neb. 2000).  The construction of an insurance contract is purely a question of law.  *Union Ins. Co. v. Land and Sky, Inc.*, 529 N.W.2d 773, 776 (Neb. 1995); *see also United Fire & Cas. Co. v. Gravette*, 182 F.3d 649, 654 (8th Cir. 1999) (holding that the construction and legal effect of a written contract are generally questions of law).

### B.  Choice of Law

The parties argue that either the law of Nebraska or the law of Virginia applies to this case.  In a diversity case, the forum state's choice of law rules govern.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Nebraska generally follows the Restatement (Second) of Conflicts of Laws.  *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001).[7]  Nebraska courts are guided by the Restatement § 193 to determine the choice of law with respect to an insurance contract.  *See Mertz v. Pharmacists Mut. Ins. Co.,* 625 N.W.2d at 197, 202-03 (Neb. 2001) (referring to sections of the Restatement that deal with conflict of laws disputes involving specific types of contracts as providing "guidance").   The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship to the transaction and the parties.   Restatement (Second) of Conflicts of Laws § 193.  There is thus a presumption in favor of the law of the "state which the parties understood was to be the principal location of the insured risk during the term

---

[7]For a general discussion of conflict decisions and their evolution in Nebraska, see Patrick J. Borchers, *Nebraska Choice of Law:  A Synthesis*, Creighton Law Review, Vol. 39, No. 1 2005, at 1.

of the policy" with respect to casualty insurance.  *General Ceramics, Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 653 (3d Cir. 1995).

Although the court is inclined to find that the presumption in favor of Nebraska has not been rebutted, it need not make that determination since there has been no showing that the law of Nebraska differs significantly from the law of either Virginia or Illinois with respect to any relevant issue in this action.  When the relevant legal principles are the same in both states, "what has come to be called a false conflict " is presented and the court need not resolve the choice of law issue.  *See Leonards v. Southern Farm Bureau Cas. Ins. Co.*, 279 F.3d 611, 612 (8th Cir. 2002).  Accordingly, the court finds Nebraska law should apply to the rights and obligations of the parties under the contracts of insurance at issue.

### C.  Insurance Law

Under Nebraska law, courts must construe insurance policies to "give effect to the parties' intentions at the time the contract was made."  *Katskee v. Blue Cross/Blue Shield of Neb.*, 515 N.W.2d 645, 649 (Neb. 1994).  An insurance contract will be interpreted in accordance with the reasonable expectations of the insured at the time of the contract and, in case of doubt, the policy will be liberally construed in favor of the insured.  *Hemenway v. MFA Life Ins. Co.,* 318 N.W.2d 70, 74 (1982).  A contract must be construed as a whole, and if possible, effect must be given to every part thereof.  *Baker's Supermarkets, Inc. v. Feldman*, 502 N.W.2d 428, 433 (Neb. 1993).     In discerning the parties' intentions, courts should first determine as a matter of law whether a policy is ambiguous.  *Katskee,* 515 N.W.2d at 649.  An insurance policy is ambiguous when a word, phrase, or provision in the

contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Poulton v. State Farm Fire and Cas. Cos.*, 675 N.W.2d 665, 673 (Neb. 2004). Where a clause in an insurance contract can be fairly interpreted in more than one way, there is ambiguity to be resolved by the court as a matter of law. *Malerbi v. Central Reserve Life of N. Am. Ins. Co*, 407 N.W.2d 157, 162 (Neb. 1987).

Courts should determine whether a contract is ambiguous "on an objective basis, not by the subjective contentions of the parties" and are therefore not compelled to find ambiguity simply because the parties suggest opposing interpretations. *Fraternal Order of Police, Lodge No. 2 v. County of Douglas,* 612 N.W.2d 483, 487 (Neb. 2000). The resolution of an ambiguity in a policy of insurance turns not on what the insurer intended the language to mean, but what a reasonable person in the position <u>of the insured</u> would have understood it to mean at the time the contract was made. *Malerbi,* 407 N.W.2d at 163 (emphasis added); *Olson v. Le Mars Mut. Ins. Co. of Iowa,* 696 N.W.2d 453, 458 (Neb. 2005). If a court concludes that a policy is ambiguous it "may employ rules of construction and look beyond the language of the policy to ascertain the intention of the parties." *Katskee,* 515 N.W.2d at 649. Rules of construction require that in the case of such ambiguities, the construction favorable to the insured prevails so as to afford coverage. *Malerbi*, 407 N.W.2d at 162-63 (noting that the rule "has evolved from recognition of the fact that the insurer as drafter of the policy is responsible for the language creating the ambiguity"). When an insurer wishes to limit its coverage, it is the duty of the insurer to draft the terms precisely. *Id.* at 163.

However, if a court determines that a policy is not ambiguous then it "may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning

21

as the ordinary or reasonable person would understand them."  *Id.*  In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the policy. *Id.*  When interpreting the plain meaning of the terms of an insurance policy, a court prefers "the natural and obvious meaning of the provisions in a policy" over a "fanciful, curious, or hidden meaning."  *Id.*  Ambiguity will not be read into policy language which is plain and unambiguous in order to construe against the preparer of the contract.  *Poulton,* 675 N.W.2d at 673.

Where coverage is denied, the burden of proving coverage under a policy is upon the insured.  *Farm Bureau Ins. Co. of Nebraska v. Martinsen*, 659 N.W.2d 823, 827 (Neb. 2003).  However, the burden to prove that an exclusionary clause applies rests upon the insurer.  *Farmers Mut. Ins. Co. of Nebraska v. Kment*, 658 N.W.2d 662, 667 (Neb. 2003). Exclusionary clauses will be liberally construed in favor of the insured.  *See, e.g., Modern Sounds & Sys., Inc. v. Federated Mut. Ins. Co.*, 262 N.W.2d 183, 187 (Neb. 1978) (broadly interpreting theft coverage and narrowly construing a conversion exclusion so as to provide coverage).

In the absence of some contractual provision to the contrary, the risk of loss by windstorm, fire, etc. to a new building in the course of construction is normally on the builder, that is, he is obligated to restore the building damaged or destroyed.  *Midwest Lumber Co. v. Dwight E. Nelson Const. Co.*, 196 N.W.2d 377, 379 (Neb. 1972).  A building contractor who contracts to construct a building has an insurable interest in the building during the course of construction, as does the owner, and both interests can be insured in the same policy.  *Id.*  (noting that "[t]he reason for including a specific provision for 'Builders risk or fire and extended coverage insurance . . . paid for by the owner' could be

22

only to protect the separate interest of both [the owner and contractor] and to determine how the cost thereof was to be paid.")

The term "inland marine coverage" encompasses a variety of specialized insurance coverages, and it "'function[s] basically as a form of property insurance, even though the policy may explicitly contemplate that the value of the property will be payable to the owner rather than the insured.'" *Ohio Cas. Ins. Co. v. Carman Cartage Co., Inc.*, 636 N.W.2d 862, 866 (Neb. 2001), *quoting* 11 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 154:3 at 154-11 (Rev. ed. 1998). "Builders risk" insurance is a unique form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property for which the insured has an insurable interest. *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 867 So. 2d 651, 659 n.8 (La. 2004). The purpose of builder's risk insurance is to compensate for loss due to physical damage or destruction caused to the construction project itself. *Southern Cal. Edison Co. v. Harbor Ins. Co.*, 83 Cal. App.3d 747, 757 (1978). A policy of insurance containing a "'builder's risk' clause or clauses should be construed reasonably and if uncertain in meaning, in favor of the contention of the insured so as to cover if possible a risk obviously sought to be insured." *Ira S. Bushey & Sons v. American Ins. Co.*, 142 N.E. 340, 341-42 (N.Y. 1923).

Generally speaking, the "your work" exclusions in a commercial general liability policy operate to prevent liability policies from insuring against an insured's own faulty workmanship, which is a normal risk associated with operating a business. *Auto-Owner's Ins. Co. v. Home Pride Cos.*, 684 N.W.2d 571, 579 (Neb. 2004). However, such an exclusion will not serve to exclude a damage claim that "extends beyond the cost to simply

23

repair and replace the contractor's work." *Id.* at 577.  Thus, a standard commercial general liability policy will cover an insured contractor for the faulty workmanship of a contractor that it hired.  *Id.* at 577 (noting that "although a standard CGL policy does not provide coverage for faulty workmanship that damages only the resulting work product, if faulty workmanship causes bodily injury or property damage to something other than the insured's work product, an unintended and unexpected event has occurred, and coverage exists"); *see also*, *National Union Fire Ins. Co. v. Structural Systems Technology, Inc.*, 964 F.2d 759, 762 (8th Cir. 1992) (court concludes that tower constitutes real property and thus tower not excluded under the personal property exclusion).  Nebraska courts construe the term accident within the meaning of liability insurance contracts to include "'any event which takes place without the foresight or expectation of the person acted upon or affected thereby.'"  *Id.* (quoting *Farr v. Designer Phosphate and Premix Int'l, Inc.,* 570 N.W.2d 320, 325 (Neb. 1997).  An insurer's duty to defend is distinct from and broader than its duty to indemnify.  *Allstate Ins. Co. v. Novak*, 313 N.W.2d 636, 638 (1981); *Chief Indus., Inc. v. Great Northern Ins. Co.*, 612 N.W.2d 225, 230 (Neb. 2000) (noting "the duty to defend can exist separate and apart from the duty to provide coverage").  An insurer must defend its insured:  (1) when the allegations in the petition, if true, would obligate the insurer to indemnify the insured; or (2) when a reasonable investigation of the facts by the insurer would, or does, reveal facts that would obligate the insurer to indemnify the insured.  *Mapes Indus., Inc. v. United States  Fid. & Guar. Co.*, 560 N.W.2d 814, 817 (Neb. 1997); *Novak*, 313 N.W.2d at 641-42.  Once a complaint states one claim that is potentially within the policy's coverage, the insurer has a duty to accept defense of the entire lawsuit even

though other claims in the complaint may fall outside of the policy's coverage.  *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 537 (8th Cir. 1970) (applying Nebraska law).

Primary insurance coverage is provided when, under the terms of the policy, liability attaches immediately upon the happening of an occurrence that gives rise to liability, as opposed to excess or secondary coverage, which attaches only after a predetermined amount of primary coverage has been exhausted.  *Midwest Neurosurgery, P.C. v. State Farm Ins. Cos.*, 673 N.W.2d 228, 235 (Neb. Ct. App.), *aff'd*, 686 N.W.2d 572 (Neb. 2004).  True excess and umbrella policies "*require* the existence of a primary policy as a condition of coverage" and their express purpose is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage.  *National Sur. Corp. v. Ranger Ins. Co.,* 260 F.3d 881, 885 (8th Cir. 2001) (emphasis in original).

Insurance policies often contain "other insurance" clauses, which purport to reduce the insuring company's liability when there is other insurance to cover the same loss.  *See In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir. 2003).  When two policies provide coverage for the same incident, the question of which policy provides primary coverage is a legal question determined by examination of the language of the policies at issue.  *United States Fid. & Guar. Ins. Co. v. Commercial Union Midwest Ins. Co.*, 430 F.3d 929, 933 (8th Cir. 2005).  Other insurance clauses fall into three categories: (1) pro rata clauses which provide that the insurer will pay its pro rata share of the loss, usually in the proportion which the limits of its policy bear to the aggregate limits of all valid and collectible insurance; (2) excess clauses which provide that the insurer's liability shall be only the amount by which the loss exceeds the coverage of all other valid and collectible insurance, up to the limits of the excess policy; and (3) escape clauses which provide that the policy affords no

25

coverage at all when there is other valid and collectible insurance.  *In re Popkin & Stern*, 340 F.3d at 716.

Under Nebraska law, where two or more policies provide coverage for the particular event and all the policies in question contain "excess insurance" clauses, it is generally held that such clauses are mutually repugnant and must be disregarded, rendering each company liable for a pro rata share of the judgment or settlement.  *Polenz v. Farm Bureau Ins. Co of Nebraska* , 419 N.W.2d 677, 684 (Neb. 1988).  *Cf. Allied Mut. Ins. Co. v. Universal Underwriters Ins. Co.,* 657 N.W.2d 905, 907 (Neb. 2003) (noting, with respect to automobile insurance, that when insurance policies contain mutually repugnant language intended to restrict or escape liability for a particular risk in the event of other insurance, the owner's policy provides primary coverage and the driver's policy provides excess coverage).  Clauses in insurance policies are "mutually repugnant" when enforcing the clauses would leave the insured individual without coverage.  *In re Popkin & Stern*, 340 F.3d at 716.

### D.  Application to Policies

### 1.  Fireman's Fund

Property and interests covered under the  Fireman's Fund Policy are "materials, supplies, machinery, equipment and fixtures, property of the Insured or <u>similar property of others for which the Insured has assumed liability</u> and which the insured has contracted to install or erect. . . ."  The court finds the tower at issue comes within this coverage because it is property for which SST assumed liability.  A contractor has an insurable interest in property on which he is working, and SST expressly assumed liability for damage to the tower when it agreed to provide builder's risk insurance for the tower.

26

There are two sets of declarations in the Fireman's Fund Policy: one is the General Declarations that provide "Inland Marine Coverages" and the second is the "Installation Floater" Declarations.  No clause limiting coverage to any particular site or time period is provided in the policy.  The property covered is not specified with any more particularity than the general description of "interests covered."  From a reading of the policy as a whole, the property contemplated to be covered under the policy is logically any tower that SST is either constructing or repairing.

Fireman's Fund's contention that two types of coverage were provided–full coverage for newly constructed towers and coverage only for SST's own materials for towers undergoing repair–is not supported in the policy document.  At the least, the policy is ambiguous on coverage.  Because Fireman's Fund drafted the policy, the omission of any limitation of coverage should be construed against Fireman's Fund.

The language of the policy itself does not support a distinction between the two types of coverage.  The fact that the policy required the reporting of two values: one for completed tower value and one for monthly receipts for repair work, does not imply that coverages would be different for one or the other.  If Fireman's Fund intended that to be the case it could have easily provided so.  Nowhere in the policy is it stated or implied that the towers upon which SST was working would be covered under the Inland Marine Policy for the risk of collapse only if they had been reported under "completed tower value," but not covered if reported under "monthly receipts for service work."  SST has shown that it reported work on the KDUH tower on the basis of "Monthly Receipts for Service Work," as specified on the Declaration Page.  Fireman's Fund reviewed and accepted SST's monthly reports, clearly labeled "Builders' Risk Reports," and calculated premiums thereunder.

27

Fireman's Fund knew that SST was in the business of constructing towers with high values, and then repairing, restoring and modifying the towers. The nature of the risk with respect to constructing, installing, repairing or replacing the towers is the same–that is, danger of tower collapse. Fireman's Fund devised the reporting scheme. Accordingly, the court finds that a reasonable insured would understand the policy to provide builder's risk coverage for the damage to the Hemingford tower.

Several additional factors contribute to the finding that an insured's reasonable understanding would be that the policy provided "builder's risk" insurance. First, the limit of liability on the policy was $2.5 million, the same amount of coverage that SST agreed to provide in its contract with Duhamel. Second, the policy includes an additional endorsement that extends coverage beyond the boundaries of Fireman's Fund's argued limit: the Debris and Pollutant Removal Policy Amendment provides broad coverage for debris and pollutant removal, indicating the parties' intention to cover more than simply SST's own materials. Similarly, the express addition of coverage for a collapse would be rendered meaningless in the context of coverage for only SST's own equipment.

Notably, Fireman's Fund's assertion that the policy was intended to cover value for total loss only with respect to property whose value was reported under subsections 1 and 2 of the policy is belied by the fact that SST had no property listed under subsections 1 and 2 for most of the time it reported. In fact, the only tower "currently under construction" was the Brown Road tower in Orlando, Florida, in October 2000 thru February 2001. The court can afford no weight to Fireman's Fund's assertion that SST would have known the tower was not covered because its premium rates were low. As drafters of the policy, Fireman's Fund set the rates and devised the reporting scheme and there is no evidence from which

28

to draw any conclusion on how the rates compared to other rates vis-a-vis coverage provided.  SST would have no reason to have bargained for a $2.5 million limit of liability if it anticipated such meager coverage.  Accordingly, Fireman's Fund provides coverage for SST's liability to the Hemingford tower.

Moreover, the court finds that the limit of liability under the policy is $2.5 million. Fireman's Fund's reliance on a limitation of $2 million is misplaced.  The limitation of $2 million limitation applies only to the coverage provided for flood or earthquake damage. Similarly the requirement of "separate underwriting for towers over 2 million" applies only to coverage for those risks, as evidenced by the requirement that the insured disclose the site's proximity to coasts and bodies of water.

### 2.  Great American

The court similarly finds that Great American's Policy provides coverage to SST. Great American essentially concedes that the tower comes within the ambit of the policy's coverage, but relies on the application of an exclusion to support its denial of coverage. The burden is on Great American to show the exclusion applies and the exclusion will be applied narrowly.  The "your work" exclusions relied on by Great American come into play only with respect to damages for SST's (or its subcontractor's) own operations or products vis-a-vis the owner.  See *Auto-Owner's Ins. Co. v. Home Pride Cos.*, 684 N.W.2d at 577. Accordingly, the court finds Great American's policy covers Duhamel's property damage claim.

### 3.  National Fire

The National Fire Policy also provides coverage to SST as an additional insured. National Fire's denial is based on the collapse exclusion.  National Fire relies on its

collapse hazard exclusion in support of the denial of coverage. That exclusion is inapplicable because the exception to the exclusion for property damage for "operations performed for you by others" clearly includes the negligent acts that resulted in liability on the part of SST.

The court is not persuaded that National Fire's proposed definition of "you" to mean Mid-Central only would result in exclusion of coverage. Whether "you" refers to Mid-Central or SST makes no difference. Even assuming "you" refers to Mid-Central, it is clear that the Mid-Central was performing work, pursuant to contract, for SST while working on the tower. The court finds the exception to the exclusion applies, and the collapse hazard exclusion provides no basis for denial of coverage. In addition, with reference to any work performed on a transmission tower, the exclusion of "collapse" would eliminate coverage for the principal risk that necessitated coverage.

The court finds that the National Fire Policy provides coverage for SST for the damage to the tower as a result of the collapse. The coverage is extended to SST specifically for liability arising out of SST's acts or omissions in connection with their general supervision of the ongoing operations that Mid-Central performed for SST (pursuant to the contract) on the tower. Failure to supervise was one of the grounds for imposition of liability on SST. SST has met its burden of showing that the damage comes within the coverage of the policy.

The National Fire Policy and the Great American Policy again contain mutually repugnant "excess" clauses, accordingly, the court finds that National Fire and Great American should share liability, pro-rata, for damages as a result of the tower's collapse.

**4.  Lloyd's, London**

The court finds that the Lloyd's, London Policy does not cover the risk that caused the collapse.  There is no evidence that negligence in design or engineering caused the collapse.

### 5. Zurich

Although Zurich's Policy would cover negligence in supervision under its construction management provisions, the court finds that SST's failure to disclose that the Hemingford tower had collapsed is fatal to its claim of coverage under the Zurich Policy.

### 6. Apportionment

Having found that the Fireman's Fund, Great American and National Fire policies all provide coverage for the loss at issue, the court must determine how to apportion coverage for that loss among the insurers.  Each policy contains an "other insurance" clause limiting its coverage if the loss was also covered by another policy.

The other insurance clause in the Fireman's Fund's Policy makes its coverage excess to any other valid and collectible insurance.  This clause is in direct conflict to the other insurance clause in the Great American Policy that provides its coverage is primary except with respect to property damage covered under a builder's risk policy.  The other insurance clause in the National Fire Policy, that provides that the policy's coverage is excess to any other primary coverage, is in direct conflict to the provision in the Great American Policy that provides its coverage is excess to any other primary policy that adds its insured as an additional insured.  The clause also conflicts with the Fireman's Fund clause above.  If full effect were afforded to all of these provisions, the insured would have no coverage.  Accordingly, the court finds that each of the policies contain mutually repugnant excess insurance clauses and the excess clauses must be disregarded,

31

rendering each insurer liable for a pro rata share of the judgment up to its single-occurrence limits.[8]

### 7.  Duty to Defend

The court's finding of coverage to SST for its liability to Duhamel under policies issued by Fireman's Fund, Great American, and National Fire means that these insurers should also share defense costs.  Accordingly, a declaratory judgment will be entered to that effect.   Accordingly,

IT IS ORDERED THAT:

1.    The motions for summary judgment of Structural Systems Technology, Inc., plaintiff in 8:03CV341 and defendant 8:04CV194 (Filing No. 58 in 8:03CV341, Filing No. 97 in 8:04CV194) are granted with respect to Fireman's Fund, plaintiff in 8:03CV341 and defendant in 8:04CV194, defendant Great American, and defendant National Fire; a Judgment for declaratory relief will be entered in favor of SST and against Fireman's Fund, Great American, and National Fire on their respective claims.

2.   Duhamel Broadcasting Enterprises' motions for summary judgment (Filing Nos 58 & 100, supplemented by Filing Nos. 113 & 114 in 8:04CV194, and Filing No. 61 in 8:03CV341), are granted with respect to Great American and National Fire.

3.   The motion for Summary Judgment of Zurich American Insurance Co. (Filing No. 92 in 8:04CV194) is granted; judgment will be entered in favor of Zurich on its cross-claims against Great American, National Fire, and   Lloyd's, London; Structural System's Technology's claim against Zurich will be dismissed.

---

[8]With respect to National Fire, its coverage of SST as an additional insured should be pro-rata notwithstanding any primary coverage of the subcontractor, Mid-Central, for the loss.

4.  Underwriter's at Lloyd's of London's motion for summary judgment (Filing No. 101 in 8:04CV194) is granted; judgment will be entered in favor of Lloyd's, London on its cross-claims against Great American, National Fire, and  Lloyd's, London; Structural System's Technology's claim against Zurich will be dismissed.

5.  Great American's claim for contribution for defense costs against National Fire is granted.

6.   A Judgment in accordance with this Memorandum and Order will be entered in a separate document.

DATED this 28thday of March, 2006.

BY THE COURT:


s/Joseph F. Bataillon
JOSEPH F. BATAILLON
United States District Judge